IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

NICHOLAS DORE

                PLAINTIFF

VS.          NO. 14-3069 JLH

DANIEL SUTTERFIELD, BOTH PERSONALLY
AND IN HIS OFFICIAL CAPACITY AS POLICE
CHIEF FOR THE BULL SHOALS POLICE
DEPARTMENT, and DAVID CHATMAN, BOTH
PERSONALLY AND IN HIS OFFICIAL
CAPACITY AS A POLICE OFFICER FOR THE
BULL SHOALS POLICE DEPARTMENT and
THE CITY OF BULL SHOALS, ARKANSAS

                DEFENDANTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEPOSITION OF DAVID CHATMAN

## TAKEN IN MOUNTAIN HOME, ARKANSAS

## ON AUGUST 4, 2015

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

HENDRIX REPORTING SERVICE
1701 SOUTH ARCH STREET
LITTLE ROCK, AR 72206
501-372-2748

CONDENSED

Exhibit F-- Deposition of David Chatman

## Page 11

1  Q  So it was after you had got to the residence, and then
2  that's when Chief Sutterfield told you there was a gun?
3  A  He actually told me on the way to the residence.
4  Q  But you didn't hear either Cleta, you didn't hear Cleta
5  say that and you didn't hear any of the conversation between
6  Cleta's daughter and Chief Sutterfield, correct?
7  A  Correct.
8      MR. MOSLEY:  Can we go off the record for one
9  second?
10     (Off record discussion)
11     MR. GIBSON:  We'll go back on.
12
13 MR. GIBSON: (Continuing)
14 Q  So Chief Sutterfield, who makes the decision to breach
15 the door?
16 A  Chief Sutterfield.
17 Q  And to your understanding, why?
18 A  At the time it was because he was going to arrest
19 Nicholas Dore.
20 Q  Did you understand that he had the lawful right to kick
21 down the door?
22 A  At that time I believed he did.
23 Q  Do you believe that now?
24 A  No, sir.
25 Q  And what would be the issue with it now?

## Page 12

1  A  Once I went to the police academy and got trained on it,
2  I learned that nobody is in, you know, immediate physical
3  harm at that time, that you don't breach the door and go in,
4  you do an arrest warrant and, you know.
5  Q  But it was your understanding Chief tells you, I guess
6  the chief tells you, 'We're going in,' you form up, go in.
7  A  I can't say that the chief actually said those exact
8  words. I know we lined up. Dan kicked the door a couple
9  of times. He went in, Brian went in and I went in.
10 Q  Was there any conversation between the PD and Mr. Dore
11 from the time that you guys get there and before the door
12 gets kicked?
13 A  We tried talking to Mr. Dore, and he wouldn't say
14 anything back to us.
15 Q  You said you did have, though, visual confirmation that
16 he was in the house?
17 A  Correct.
18 Q  Was it your indication that anybody else was in the
19 house?
20 A  Not to my knowledge.
21 Q  So I'll take you back. You breached the residence, and
22 take us from there.
23 A  We breach the door, we go in, we make our way to the
24 living room. Nicholas Dore is laying on the couch. He's
25 got, the way the couch is positioned, if this is the couch

## Page 13

1  (Demonstrating) I mean, I don't know if we can do this, but
2  if this is the couch, his head is here, his body is there,
3  his feet is where you're at, okay? And we're coming in from
4  this way (Demonstrating).
5     He's got his right arm tucked up by his head and his
6  left arm is under a blanket. We're spread out. I go, since
7  I'm the last one in, I go the farthest toward to the left,
8  like towards his feet, and Brian is in the middle and Dan
9  is towards his head.
10    Dan is telling Nicholas Dore to show his hands, you
11 know, "Show me your hands, show me your hands, show me your
12 hands." Nicholas Dore at one point looks up at Dan and
13 looks right back down.
14    Dan takes the shotgun that he has and hits him in the
15 midsection where his hand, where you can see the lump in
16 the, you know, blanket from where his hand is.
17    Nicholas Dore raises up, we pull him off the couch and
18 get him on the floor. We get his right hand handcuffed and
19 he's laying on his left hand. Dan at that time, we're trying
20 to get his left hand, his left hand won't come out. Dan
21 takes the cartridge off of his taser, drive stuns Mr. Dore
22 I believe two times. Nicholas Dore finally gives up his
23 hand.
24    As soon as I get the other hand, his left hand
25 handcuffed, Nicholas Dore starts yelling and screaming and

## Page 14

1  cussing at us. I'm straddled on top of Mr. Dore at this
2  point, Brian is kneeled down between a glass coffee table
3  and Mr. Dore in the middle and Dan is at the front.
4      I get him handcuffed, Brian stands up. I'm in the
5  process of getting up. I heard Dan say something along the
6  lines of mother fucker, and he takes the butt of the shotgun
7  and hits Mr. Dore in the side of the head with the shotgun
8  as Mr. Dore is laying there. The way he was facing, I
9  believe it was his left side that he hit.
10     Stand up, we get Mr. Dore up and we're holding him and
11 he's still yelling and screaming at us. Brian walks off,
12 he walks outside. We're dealing with Mr. Dore. Since his
13 left hand was the one covered up on the couch under the
14 blanket and then on the floor as well, we're looking for a
15 gun to see if he had a gun on the floor.
16 Q  Go ahead.
17 A  Okay. We're looking for a gun to see if the gun was on
18 the floor, if there was, you know, one in question. Dan and
19 Nicholas Dore are arguing and cussing at each other. At
20 that point Dan has got Mr. Dore up under his arm holding him,
21 I mean, like we're trained to do for an escort. Dan, I don't
22 know what Dan's intentions were.
23     Dan jerks Mr. Dore, which jerks me. I end up trying to
24 step over this glass coffee table that he's got without
25 knocking it over. Long story short, I fall onto Nicholas

DAVID CHATMAN
NICHOLAS DORE VS. CITY OF BULL SHOALS, ET AL.

Page 39

please?
THE WITNESS: Which one?
MR. CHARTON: Alkire.
THE WITNESS: A-L-K-I-R-E.
MR. CHARTON: Thank you.
THE WITNESS: A lot of misconceptions is on the front page of this report it does have a box where it says "Approved by." However, in order to put that in there you would have to do it with the reporting officer who actually fills out the report would have to put that in there. Obviously that doesn't make much sense since it hasn't been approved by anybody at the time that we're writing it.

MR. GIBSON: (Continuing)
Q  So this front page is compiled and then you make it and so the first page has to be -- what you're saying is the first page has to be put together before you can even give it to somebody to review.
A  Correct. This is the actual report that's done. At a later date if Dan was to come back in and check, this is a drop-down box where it says "Approving Officer," put his name in and print it off, print off a copy where this was approved, you'd get a whole other four pages of this. So it was a lot easier and made more sense to initial that he had read it and

Page 40

approved it.
Q  And so when it comes to tasing after he's handcuffed, you would say that he wasn't tased to your recollection?
A  To the best of my knowledge, he was not tased after he was placed in handcuffs.
Q  And you said that the FBI came down and questioned you.
A  That's correct.
Q  Did they tell you why they were there?
A  They did.
Q  What did they tell you they were there for?
A  They told me they were there about a report of excessive force against Dan Sutterfield in the arrest of Nicholas Dore.
Q  Had you had any knowledge prior to this that the FBI was looking into this?
A  Not until they pulled me out of the classroom.
Q  Were you surprised?
A  Yes, I was.
Q  Were you criminally charged?
A  No, I was not.
Q  Were you offered immunity?
A  To a certain extent.
Q  What extent?
A  The extent was is if I testified in federal court they would offer me immunity on anything new that I said. However, anything that I had already told them in my interview during

Page 41

questioning that they could still use against me in federal court.
Q  And did you say you were never charged?
A  I was not.
Q  Okay. Were you ever dishonest with the FBI?
A  No, I was not. Well, I mean, the first probably 45 minutes I was. You know, I stuck by the report and said what was in the report.
Q  Why did you do that?
A  I didn't want to get anybody in trouble.
Q  Who were you afraid of getting in trouble?
A  Myself and Chief Sutterfield.
Q  What did you think you had done wrong?
A  Well, I mean, like I said, there was certain parts of the report that were omitted, were not in there. Obviously I didn't want to get in trouble for that. And I knew Dan had hit him with a shotgun and I didn't want Dan to get in trouble for that.
I also found out prior to there and being in the academy that we had went into, you know, we had kicked the door, Dan had kicked the door in and we had went inside and we most likely should not have.
Q  When was it that you decided to come clean with the FBI agents?
A  Probably about 40 minutes into talking with them.

Page 42

Q  What caused you to change your mind?
A  I don't remember. I finally just looked at I don't remember what his name was and told him. I told him that Dan had hit him in the head with a shotgun.
Q  Had Dan ever told you to lie about that?
A  We had never, me and Dan have never discussed the case after that, after that actual date that it happened.
Q  The day that you're writing this report does Mayor Powell ever come into what I'll call the PD office? Does he ever come in the room?
A  No, I hadn't seen Mayor Powell.
Q  When was --
A  He may have stopped in and said like bye, because they closed at 4:00 and so this was written at 3:40. I mean, he may, you know, for a brief second, but as far as actually coming in and talking about the incident, he didn't.
Q  When did you go to the police academy?
A  January of 2014.
Q  When did you sign up for the police academy?
A  I don't recall what day it was.
Q  Do you recall, I mean, is it the year before? Was there a certain enrollment period?
A  They have a year to put me through the academy from the date of hire full-time.
Q  Okay.

11 (Pages 39 to 42)

HENDRIX REPORTING SERVICE
LITTLE ROCK, ARKANSAS

**Exhibit F-- Deposition of David Chatman**

Page 43

1  A  So it was in 2013. I believe I was already signed up by
2  the time of this incident but I don't know for sure. I did
3  know it was already planned out of me going in January, and
4  that was our slowest time of the year.
5  Q  And so you're saying in July of '13 you were already
6  enrolled for January of '14?
7  A  I believe I was.
8  Q  Who paid for the police academy?
9  A  Well, technically the police academy itself was free.
10 Q  Who put you up while you were down there?
11 A  The college that I went to did.
12 Q  And what's that?
13 A  Black River Technical College Law Enforcement Training
14 Academy.
15 Q  Who paid for Black River, it's free?
16 A  It's free. That's the police academy itself, it's free.
17 The only thing that has to be paid is that they pay for, they
18 pay my salary; the police department pays my salary while I'm
19 there.
20 Q  Is there ever a discussion about -- I guess when did you
21 get hired on with Bull Shoals Police Department?
22 A  I started part-time, I think it was July of 2012. I
23 went full-time approximately January or February of 2013.
24 Q  Who was responsible for hiring you when you originally
25 got on I guess part-time in 2012?

Page 44

1  A  Chief Dan Sutterfield.
2  Q  Can you tell me about that hiring process in 2012?
3  A  I get hired, I say part-time, it actually was, their
4  position, it was unpaid. I was an actual part-time officer,
5  paid part-time officer for the City of Flippin. I spoke to
6  Dan Sutterfield while we were, he had the Flippin Police
7  Department up there doing a, basically checking people for
8  warrants, you know, trying to go out and do a saturation.
9    I'd mentioned to him about doing reserve work up there
10 and he said, "Sure, come in and talk to me." I went in one
11 day and sat down with him and told him I'd like, you know,
12 to get on part-time up there. I basically turned in my
13 paperwork to him and that was it.
14 Q  And what is that, when you say "paperwork"? Do you just
15 fill out an application?
16 A  Fill out an application, my certifications, the thing
17 law enforcement called F forms, since everybody gets sent
18 to Standards, all the paperwork that gets sent to Standards.
19 Q  Okay. What certifications did you have when you started
20 as a reserve?
21 A  I was ACIC certified, I was reserve certified, taser
22 certified, pepper spray certified, BAC certified.
23    MR. CHARTON: As a reserve officer?
24    THE WITNESS: I got most of that in the jail
25 when I worked in the jail.

Page 45

1    MR. CHARTON: Can you tell us what that
2  acronym is that you --
3    THE WITNESS: ACIC? It's Arkansas Crime
4  Information Center. It's what we run your driver's
5  license through and license plates and stuff
6  like that.
7
8  MR. GIBSON: (Continuing)
9  Q  And you say you got hired on full-time in January or
10 February. Tell me about the transition from being a reserve
11 to being a full-time. Is there a hiring process? How did --
12 A  I don't know what their part of it was. They had
13 mentioned they were going to get another full-time position
14 and I told them I was interested in it, and Dan called me one
15 day and he told me that I'd got it.
16 Q  Who did you tell you were interested in it?
17 A  Dan Sutterfield, David Alkire and Brian Williams.
18 Q  Okay. And so you weren't certified in this July 13
19 arrest?
20    MR. MOSLEY: Objection to the form of the
21 question.
22
23 MR. GIBSON: (Continuing)
24 Q  Excuse me. You hadn't been to the police academy at
25 that time?

Page 46

1  A  Correct.
2  Q  So does that make you a certified law enforcement
3  officer?
4    MR. MOSLEY: Object to the form of the
5  question.
6    THE WITNESS: I was certified as a reserve
7  officer. I was not certified as a full-time
8  police officer.
9
10 MR. GIBSON: (Continuing)
11 Q  Was that discussed when you were hired on full-time?
12 A  It was discussed that they were going to send me to the
13 police academy and we were looking at January the following
14 year.
15 Q  Did you fill out paperwork to go to the police academy?
16 A  I did.
17 Q  But you don't recall when that would have been?
18 A  I do not.
19 Q  At any time when you were hired on full-time, did you
20 ever talk to Mayor Powell?
21 A  After -- About hiring, no. I mean, I talked to him
22 probably on a daily basis, but not during the hiring process
23 or not after I'd got hired.
24 Q  When it comes to actually just saying, 'David, you've
25 got a full-time job here,' that conversation was only with

12 (Pages 43 to 46)

**Exhibit F-- Deposition of David Chatman**

DAVID CHATMAN
NICHOLAS DORE VS. CITY OF BULL SHOALS, ET AL.

### Page 91

1. If you're a city official like a council person and you have
2. a police officer who has lied to the FBI and is potentially
3. subject to federal prosecution, would you be concerned about
4. them remaining on your police force?
5. A   I would.
6. Q   Did anyone ever prevent you from appearing at a city
7. council meeting and speaking as a citizen about your
8. termination?
9. A   No.
10. Q   Okay. You understand at city council meetings that
11. there's a portion of time where citizens are allowed to
12. come up to the podium and speak, correct?
13. A   Correct.
14. Q   All right. Because you've been to them before, right?
15. A   Correct.
16. Q   Did you ever go to the city council and speak as a
17. citizen about your employment to the city council?
18. A   No, I did not.
19. Q   Okay. So Dusty Smith, which Dusty is not his first
20. name, but Dusty is what he goes by, over in Flippin, right?
21. A   Yes, sir.
22. Q   Was he the chief when you began as a reserve or part-time
23. officer over in Flippin?
24. A   Yes, sir, he was.
25. Q   Which was it, a part-time or a reserve officer?

### Page 92

1. A   I originally began as a reserve but I believe it was
2. only for a couple of weeks before I became a paid part-time
3. officer.
4. Q   And when you do a part-time that is a certification,
5. that you have to have through the Arkansas Law Enforcement
6. Training Academy. You have to have so many hours in order to
7. become part-time, isn't that correct?
8. A   Actually part-time two is actually the same certification
9. as a reserve, it's just you're paid and you can only work so
10. many hours a week.
11. Q   Okay. And you did have some training at the time that
12. you became a reserve and part-time officer at Flippin, is
13. that correct?
14. A   Yes, sir.
15. Q   Did you receive that training when you were employed at
16. the Marion County Detention facility, some of it?
17. A   Some of it.
18. Q   Okay. Did you ever receive force training?
19. A   Not at the Marion County Sheriff's Office.
20. Q   What about Flippin?
21. A   Not at Flippin either. I received that when I went
22. through my reserve, reserve class.
23. Q   When did you go to reserve class?
24. A   It would have been the end of 2011, I believe.
25. Q   Okay. During that class were you taught how to

### Page 93

1. handcuff people?
2. A   I was.
3. Q   You were also taught how to handcuff people I'm assuming
4. at the Marion County -- let me finish my question -- at the
5. Marion County Detention facility, is that correct?
6. A   Yes, sir.
7. Q   And standard protocol there is you double cuff somebody
8. and then you check and make sure with a pinky for instance
9. that there's enough room in there that they're not too tight,
10. correct?
11. A   Yes, sir.
12. Q   And you knew that on the day of the arrest of Mr. Dore,
13. correct?
14. A   Yes, sir.
15. Q   Okay.
16.         MR. CHARTON: May I correct something you said?
17.     You "double cuff." You meant double lock?
18.         (Off record discussion)
19.
20. MR. MOSLEY: (Continuing)
21. Q   Double lock.
22. A   Yes, sir.
23. Q   Were you given policies and -- Okay. So before you went
24. to Bull Shoals you had Flippin PD's policies and procedures.
25. A   Correct.

### Page 94

1. Q   And they have provisions regarding excessive force and
2. not using excessive force, correct?
3. A   Right.
4. Q   And they have provisions regarding tasers, correct?
5. A   Yes, sir.
6. Q   And you had reviewed those.
7. A   Yes, sir.
8. Q   Okay. And you said that you were relying on your review
9. of those policies and procedures when you were at Bull Shoals
10. because you had not been given a manual, correct?
11. A   Correct.
12. Q   Did you understand that there was a manual at Bull Shoals
13. regarding policies and procedures?
14. A   I had seen a manual at one time that was dated back in I
15. believe the late '90s or maybe even 2000, and then I believe
16. that was in Dan Sutterfield's office.
17. Q   Did you still have your Flippin manual when you were at
18. Bull Shoals?
19. A   Yes, sir. It was actually on a disk, a CD disk.
20. Q   So if you needed it, you would refer to that when you
21. were at Bull Shoals?
22. A   Yes, sir.
23. Q   Okay. And so when a new police chief took over,
24. interim Mike Tovar, were there policy changes at Bull Shoals?
25. A   I don't know if they were changes. He actually --

**Exhibit F-- Deposition of David Chatman**

Page 95

1  Everything stayed the same that it was. He just actually
2  wrote out policies and handed them out and had people sign.
3  Me and Jeremy Melton signed for them.
4  Q  When you say everything stayed the same, you mean
5  practices that you had used as a police officer at Bull Shoals
6  became written policies at that point?
7  A  Correct.
8  Q  And those practices would have been consistent with the
9  policies that you had from Flippin?
10 A  Yes, sir.
11 Q  Okay. So they were constitutional practices?
12 A  Yes, sir.
13 Q  Okay. They weren't, you know, they didn't allow you to
14 use more force than necessary?
15 A  Right.
16 Q  Okay. And they didn't allow you to tighten handcuffs
17 down harder than you should on somebody's wrist, correct?
18 A  Correct.
19 Q  And they didn't allow you to tase somebody unless it
20 was justified, right?
21 A  Correct.
22 Q  Okay. Before the incident involving Mr. Dore when he
23 was arrested, did you have some on-the-job training at Bull
24 Shoals, too?
25 A  I did.

Page 96

1  Q  Okay. For how many months, how many weeks, what?
2  A  I believe it was for a week, maybe two weeks that I rode
3  with David Alkire. It wasn't very long because I'd already
4  been patrolling at Flippin. It was basically I learned the
5  streets and learned the city type training.
6  Q  Did you have to use force as a detention officer when
7  you were at Marion County ever?
8  A  I did.
9  Q  To restrain resistant individuals, combative
10 individuals, aggressive individuals?
11 A  Yes, sir.
12 Q  Any of those and all those?
13 A  All those.
14 Q  Okay. And I'm assuming that in many situations you
15 would have to handcuff people when you were a Marion County
16 Detention facility officer, is that correct?
17 A  Yes, sir.
18 Q  And there's some times when things occur so quickly
19 you don't have time to double lock cuffs, isn't that
20 correct?
21 A  That is very correct.
22 Q  You go back when the situation calms down and that's
23 when you double lock cuffs and make sure you haven't
24 tightened them too hard, correct?
25 A  Yes, sir.

Page 97

1  Q  All right. So in a situation regarding Mr. Dore,
2  you're fighting him to get one arm to get one cuff on,
3  correct?
4  A  Yes, sir.
5  Q  You're fighting -- In fact, he had to get tased by Dan
6  Sutterfield just for you to get the other or one of the cuffs
7  on, correct?
8  A  Correct.
9  Q  All right. And that's proper use of taser when somebody
10 is using passive resistance and won't give up their arm,
11 isn't it, to use a taser to make them comply and give up an
12 arm when they're being resistant, is that correct?
13 A  Yes, sir.
14 Q  Okay. And then at some point he's still not giving up
15 his arm for handcuffing, correct?
16 A  The one arm was handcuffed already. We tased him to get
17 his left arm out from underneath him.
18 Q  Okay. And that worked eventually and he let his left
19 arm out?
20 A  Yes, sir.
21 Q  But that wasn't in a calm circumstance, that was in a
22 tumultuous circumstance.
23 A  Yes, sir, very much.
24 Q  Okay. How long were you in contact with Mr. Dore from
25 the time that you finally handcuffed him until the time that

Page 98

1  you passed him off to someone else, a minute, two minutes?
2  A  Likely two minutes --
3  Q  Okay.
4  A  -- at the most.
5  Q  All right. And so during that time did Mr. Dore ever
6  complain to you that the handcuffs were too tight?
7  A  No, sir.
8  Q  Okay. And who was he passed off to, Brian Williams?
9  A  Yes, sir.
10 Q  Okay. Was Brian Williams a certified law enforcement
11 officer on the date of Mr. Dore's arrest?
12 A  He was.
13 Q  Okay. If a person at Marion County had complained when
14 you were at Marion County Detention Facility that their
15 handcuffs were too tight, what would you have done?
16 A  If the situation was under control and calm, you'd check
17 their handcuffs and make sure that obviously their hands
18 aren't turning blue and the cuffs aren't too tight.
19    You make sure that you basically go back over your
20 protocol and make sure that they're double locked and make
21 sure that you can stick a finger in there and make sure that
22 they're on properly.
23 Q  Irrespective of any written policy, that's how you guys
24 handled things at Bull Shoals before the arrest of Mr. Dore,
25 isn't it?

**Exhibit F-- Deposition of David Chatman**